# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARK BEARD, Derivatively on Behalf of FMC CORPORATION, | ) | Case No. |
| | ) | |
| | ) | |
| Plaintiff, | ) | **VERIFIED SHAREHOLDER** |
| v. | ) | **DERIVATIVE COMPLAINT** |
| | ) | |
| MARK A. DOUGLAS, ANDREW D. SANDIFER, PIERRE R. BRONDEAU, EDUARDO E. CORDEIRO, CAROL ANTHONY DAVIDSON, KATHY L. FORTMANN, C. SCOTT GREER, K'LYNNE JOHNSON, MARGARETH ØVRUM, ROBERT C. PALLASH, PATRICIA VERDUIN, and VINCENT R. VOLPE, JR., | ) ) ) ) ) ) ) ) ) ) | |
| | ) | DEMAND FOR JURY TRIAL |
| Defendants, | ) | |
| and | ) | |
| | ) | |
| FMC CORPORATION, a Delaware corporation, | ) ) | |
| | ) | |
| Nominal Defendant. | ) | |

Plaintiff Mark Beard ("Plaintiff"), by and through Plaintiff's undersigned attorneys, derivatively and on behalf of and for the benefit of Nominal Defendant FMC Corporation ("FMC" or the "Company") submits this Verified Shareholder Derivative Complaint against Mark A. Douglas ("Douglas"), Andrew D. Sandifer ("Sandifer"), Pierre R. Brondeau ("Brondeau"), Eduardo E. Cordeiro ("Cordeiro"), Carol Anthony Davidson ("Davidson"), Kathy L. Fortmann ("Fortmann"), C. Scott Greer ("Greer"), K'Lynne Johnson ("Johnson"), Margareth Øvrum ("Øvrum"), Robert C. Pallash ("Pallash"), Patricia Verduin ("Verduin"), and Vincent R. Volpe, Jr. ("Volpe") (the "Individual Defendants" and together with FMC, "Defendants") for and among other things, their breaches of fiduciary duties and violations of the federal securities laws.

- 1 -

Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to Plaintiff which are based on personal knowledge. This complaint is also based on the investigation of Plaintiff's counsel, which included, among other things, a review and analysis of: (a) public filings with the U.S. Securities and Exchange Commission ("SEC"); (b) press releases and other publications disseminated by Defendants; (c) a review of news reports, shareholder communications and postings on FMC's website; (d) publicly available filings in a related consolidated securities fraud class action lawsuit captioned *In re FMC Corporation Securities Litigation*, No. 2:25-cv-00771-GAW (E.D. Pa.) (the "Securities Class Action"); and (e) other publicly available information concerning FMC and the Individual Defendants. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action brought by Plaintiff on behalf of FMC against certain current and former officers and/or directors for breaches of fiduciary duties and violations of law from November 16, 2023 through the present (the "Relevant Period").

2.      FMC is a global agricultural sciences company based in Philadelphia, Pennsylvania that develops and sells a range of crop protection products. The Company describes itself as having one of the most productive and diversified pipelines in the industry, bringing innovative solutions in plant health, herbicides, fungicides, and insecticides. FMC sells its products to wholesale distributors located in four major regions: North America, Latin America ("LATAM"), Asia-Pacific ("APAC"), and Europe, the Middle East, and Africa ("EMEA"). These distributors then sell FMC products out of their inventories to retailers, who ultimately sell the products to farmers.

3.    In 2022, FMC and other agricultural chemical manufacturers saw record revenues as supply chain disruptions and the threat of product shortages amidst the ongoing COVID-19 pandemic led distributors to stockpile crop protection products. However, as pandemic restrictions were lifted, supply chain disruptions eased, and FMC's distributors were left holding inventories that exceeded demand. This excess inventory resulted in a revenue slowdown for FMC and similar manufacturers as distributors and retailers began to significantly reduce their orders for crop protection products. At the same time, FMC's revenues were also impacted by the growing number of generic competition for its top-selling protection products.

4.    In the third quarter of 2023, an investment firm reported that FMC had previously "concealed from investors the deterioration of [its] core business[,] resulting in an inescapable cycle of falling revenues, plummeting cash flows, [and] declining profits." The report detailed how FMC had been employing steep discounts and rebates to offload product and "shore up Company cash," including to customers with "deteriorating creditworthiness." Further, the report noted that FMC had misrepresented the threat of generic market competitors to FMC's products. On October 30, 2023, the Company reported a staggering 29% year-over-year decrease in third quarter 2023 revenues due to "channel destocking in all regions."

5.    In an attempt to improve its financial performance, on November 16, 2023, FMC introduced a "strategic restructuring plan" called "Project Focus" to maximize operational efficiencies, right-size the Company's cost base, and "normalize" distribution channel inventory levels.

6.    Throughout the Relevant Period, FMC and certain executives and directors emphasized the "excellent progress" of Project Focus and represented to investors that FMC was "reducing channel inventory every quarter" and that its channel inventories were "rebalancing"

and "normalizing" at a faster pace than expected. The Company also told investors that Project Focus would result in massive cost savings that would contribute to the Company's future profits. These assurances led the market to believe that FMC's distribution channel was successfully normalizing and that the Company was therefore able to create organic sales figures that were on track with its sales forecasts and revenue projections.

7. Unbeknownst to investors, however, FMC's Project Focus failed to improve distributors' excess inventory levels or create organic demand for its products. FMC had set unrealistic and unattainable sales targets and revenue projections, using high-risk and high-pressure sales tactics that undercut revenues and flooded unwanted product into its distribution channel, which in turn kept inventory levels in excess. FMC had also begun implementing "cost-plus" pricing arrangements with key distributors in the form of "rebates over rebates," steep discounts, granting extremely long payment terms for products, lower prices, and more sales practices. Through these undisclosed pricing arrangements, FMC increased its short-term revenue and sales numbers – at the expense of its long-term growth and expected profits from Project Focus cost savings.

8. Throughout the Relevant Period, the Individual Defendants misled FMC investors by making false and misleading statements and/or failing to disclose and actively concealing material adverse facts that: (i) FMC's Project Focus was not succeeding in its goal of meaningfully lowering FMC inventory in the distribution channel; (ii) FMC's channel inventories were not rebalancing or normalizing, and in fact, were getting worse as a result of Defendants' own undisclosed sales practices; (iii) FMC had inflated short-term revenues by engaging in manipulative sales practices; (iv) Project Focus was lagging in its goal of accelerating manufacturing cost reductions; (v) FMC's pricing arrangements with key distributors would

significantly lower FMC's revenues and profits in the near-term; (vi) FMC's risk disclosures were materially false and misleading because they characterized as mere possibilities adverse facts that had already materialized; and (vii) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading or lacked a reasonable basis.

9.    On February 4, 2025, the truth was revealed when FMC reported that its fourth quarter 2024 revenue missed consensus revenue estimates by ***$90 million*** while disclosing that "***growth was below [the Company's] expectations as [it] learned during the quarter that customers in many countries sought to hold significantly less inventory than they have historically***." The Company also revealed a disappointing 2025 financial outlook due to "***weaker demand in the channel*** as customers in many countries prioritize holding lower-than-historical levels of inventory."

10.    Later that day, the Company hosted an earnings call during which FMC's Chief Executive Officer ("CEO"), Pierre R. Brondeau, stated that "[t]he company needs a stronger reset than what I thought initially. We learned a lot in the fourth quarter, and it has become clear that we need to take more aggressive actions to reposition FMC. Above all we need to significantly lower FMC inventory in the channel, much beyond what we were expecting." Brondeau revealed that the Company had faced high pricing competition that it was "unwilling to meet, which . . . led us to . . . to walk away from unattractive sales opportunities." Brondeau stated that this strategy caused "lower-than-expected demand across most regions as customers lowered the amount of inventory they were willing to hold versus historical level[s]." He added that the Company was "not expecting behavior to change to such a degree," and that as a result of "the current high levels of FMC product in the channel, we now believe we have elevated channel inventories in some

countries in LATAM, including Brazil; Asia, including India; as well as Canada and Eastern Europe."

11. The market reacted immediately and negatively to this news, with FMC's stock price dropping $18.12 per share, or 33.5%, to close at $35.92 per share on February 5, 2025, wiping out over $2 billion in market capitalization in a single day.

12. As a result of the foregoing, FMC, as well as FMC's former CEO Mark A. Douglas, current Chief Financial Officer ("CFO") Andrew D. Sandifer, and Brondeau, were named as defendants in the Securities Class Action. The Securities Class Action has caused FMC to undertake internal investigations and to implement adequate controls, as well as exposed the Company to massive class-wide liability.

13. As a result of Defendants' wrongful acts and omissions, and the significant decline in the market value of the Company's common stock following the revelation of the fraud, the Company and its shareholders have suffered significant losses and damages. The wrongdoing committed resulted in damages to FMC's goodwill and business reputation and has exposed the Company to substantial potential liability for violations of state and federal law.

14. For these reasons and as set forth in greater detail herein, including the Board of Directors' (the "Board") unreasonable delay in investigating these matters, Plaintiff now files this action against the Individual Defendants who abandoned their fiduciary duties and should now be held accountable for the financial and reputational harm suffered by FMC and its shareholders.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") because Plaintiff's claims raise a federal question under Sections 10(b), 14(a), and 21D of the Exchange Act (15 U.S.C. §§ 78j(b),

78n(a)(1) and 78u-4(f)) and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

18.     This Court has jurisdiction over each Defendant herein because each Defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. The Court has personal jurisdiction over the nominal defendant because it is authorized to do business in this state, has consented to service in this state and its principal place of business is within this District.

19.     Venue is proper in this Court in accordance with 28 U.S.C. § 1391(b) because: (i) FMC maintains its principal place of business in this District; (ii) one or more of the Defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to FMC, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**PARTIES**

20.     Plaintiff is a current shareholder of FMC and has continuously held FMC common stock at all relevant times.

21.     Nominal Defendant FMC is a Delaware corporation with its principal executive offices located at 2929 Walnut Street, Philadelphia, Pennsylvania 19104. FMC's common stock is listed on the New York Stock Exchange (the "NYSE") under the ticker symbol "FMC."

22.     Defendant Douglas served as FMC's President, CEO, and as a Company director from 2020 until 2024. Defendant Douglas is named as a defendant in the Securities Class Action Amended Complaint. FMC paid Douglas $14,968,954 in total compensation as an executive in 2024.

23.     Defendant Sandifer has served as FMC's CFO since 2018. Defendant Sandifer is named as a defendant in the Securities Class Action Amended Complaint. FMC paid Sandifer $3,485,618 in total compensation as an executive in 2024.

24.     Defendant Brondeau has served as FMC's CEO since June 2024 and as Chairman of the Board since October 2010. He previously served as CEO from January 2010 until May 2020, President from January 2010 until May 2018, and Executive Chairman from June 2020 to April 2021. Defendant Brondeau is named as a defendant in the Securities Class Action Amended Complaint. Brondeau is Chair of the Board's Executive Committee. FMC paid Brondeau $10,783,649 in total compensation as an executive and director in 2024.

25.     Defendant Cordeiro has been on the Board of FMC since 2011. Cordeiro is the Chair of the Board's Audit Committee, a member of the Nominating and Corporate Governance Committee, and a member of the Board's Executive Committee. FMC paid Cordeiro $280,031 in total compensation as a director in 2024.

26.     Defendant Davidson has been on the Board of FMC since 2020. Davidson is a member of the Board's Audit Committee and Chair of the Nominating and Corporate Governance Committee. FMC paid Davidson $260,031 in total compensation as a director in 2024.

27.     Defendant Fortmann has been on the Board of FMC since 2022. Fortmann is a member of the Board's Compensation and Human Capital Committee and Nominating and Corporate Governance Committee. FMC paid Fortmann $255,031 in total compensation as a director in 2024.

28.     Defendant Greer served on the Board of FMC from 2002 until February 2026. During the Relevant Period, Greer served as Lead Director, as member of the Board's Executive Committee, and as member of the Board's Nominating and Corporate Governance Committee. FMC paid Greer $270,031 in total compensation as a director in 2024.

29.     Defendant Johnson has been on the Board of FMC since 2013. Johnson is Chair of the Board's Compensation and Human Capital Committee, a member of the Board's Executive Committee, and a member of the Board's Sustainability Committee. FMC paid Johnson $275,031 in total compensation as a director in 2024.

30.     Defendant Øvrum served on the Board of FMC from 2016 until February 2026. During the Relevant Period, Øvrum served as a member of the Board's Sustainability Committee and Nominating and Corporate Governance Committee. FMC paid Øvrum $240,031 in total compensation as a director in 2024.

31.     Defendant Pallash served on the Board of FMC from 2008 to February 2026. During the Relevant Period, Pallash served as member of the Board's Audit Committee and Sustainability Committee. FMC paid Pallash $245,031 in total compensation as a director in 2024.

32.     Defendant Verduin has been on the Board of FMC since 2023. Verduin is a member of the Board's Compensation and Human Capital Committee and Sustainability Committee. FMC paid Verduin $247,999 in total compensation as a director in 2024.

33.     Defendant Volpe served on the Board of FMC from 2007 until April 2023. In 2023, Volpe was a member of the Board's Audit Committee and Executive Committee. FMC paid Volpe $50,000 in total compensation as a director in 2023.

34.     Non-Party Director Michael F. Barry ("Barry") has been on the Board of FMC since February 2026. Barry is a member of the Board's Audit Committee and Compensation and Human Capital Committee. Barry is named herein solely for the purposes of demand futility.

35.     Non-Party Director Steven T. Merkt ("Merkt") has been on the Board of FMC since April 2025. Merkt is a member of the Board's Audit Committee and Nominating and Corporate Governance Committee. Merkt is named herein solely for the purposes of demand futility.

36.     Non-Party Director John M. Raines ("Raines") has been on the Board of FMC since 2024. Raines is a member of the Board's Audit Committee, and the Nominating and Corporate Governance Committee. FMC paid Raines $168,902 in total compensation as a director in 2024. Raines is named herein solely for the purposes of demand futility.

37.     Defendants Cordeiro, Davidson, and Pallash are referred to herein as the "Audit Committee Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

38.     By reason of their positions as officers, directors, and/or fiduciaries of FMC and because of their ability to control the business and corporate affairs of FMC, the Individual Defendants owed FMC and its shareholders the fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage FMC in

a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of FMC and its shareholders.

39. Each director and officer of FMC owes to FMC and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of FMC and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

40. The Individual Defendants, as officers and/or directors of a publicly held company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, had a duty to promptly disseminate accurate and truthful information regarding FMC's operations, finances, financial condition, financial statements, performance, growth, earnings, internal controls, and present and future business prospects so that the market price of FMC's stock would be based on truthful, accurate, and fairly presented information.

41. The Individual Defendants, because of their positions of control and authority as directors and/or officers of FMC, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by FMC. Because of their advisory, executive, managerial and directorial positions with FMC, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of FMC.

42. The Individual Defendants, as officers and/or directors of FMC, were required to discharge their duties by exercising reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of FMC. By virtue of such duties, the officers and directors of FMC were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and

requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)    conduct the affairs of the Company in an efficient, ethical, and businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    properly and accurately guide the public, investors, and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of internal legal, financial, and management controls such that the Company's financial reporting would be true and accurate at all times;

(d)    remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)    ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

43.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to FMC and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.

44.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of FMC, the absence of good faith on their part, and a reckless disregard for their duties to FMC and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

45.     The Individual Defendants breached their duties of loyalty and good faith by causing FMC to issue false and misleading statements concerning its financial condition. As a result, FMC has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## AUDIT COMMITTEE CHARTER

46.     FMC maintains an Audit Committee Charter which states, in relevant part:

**I. Purpose**

The Audit Committee (the "Committee") of the [Board] of [FMC] shall assist the Board in monitoring (1) the integrity of the financial statements of the Company, (2) the independent auditor's qualifications and independence, (3) the performance of the Company's internal audit function and independent auditor and (4) the compliance by the Company with legal and regulatory requirements.

The Committee shall prepare the report required by the rules of the [SEC] to be included in the Company's annual proxy report.

\*        \*        \*

**IV. Authority, Duties, and Responsibilities**

\*        \*        \*

A. Review Procedures

1.  Meet to review and discuss with management and the independent auditor the annual audited financial statements, including disclosures made in Management's Discussion and Analysis and recommend to the Board whether

the audited financial statements should be included in the Company's Form 10-K.

2. Meet to review and discuss with management and the independent auditor the Company's quarterly financial statements prior to the filing of its Form 10-Q, including disclosures made in Management's Discussion Analysis, and the results of the independent auditor's review of the quarterly financial statements.

3. In connection with the reviews of the Form 10-K's and Form 10-Q's above, review and discuss with management and the independent auditor the following matters, as applicable:

   a. Significant issues regarding accounting principles, financial reporting, financial statement presentation, and judgments made in the preparation of the Company's financial statements, including any significant changes in the Company's selection or application of accounting principles;

   b. Significant issues as to the adequacy of the Company's internal controls and any special steps adopted in light of material control deficiencies;

   c. The independent auditor's report on:

      i. All critical accounting policies and practices to be used;

      ii. Alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor;

      iii. Other material written communication between the independent auditor and management, such as any management letter or schedule of unadjusted differences;

   d. Matters required to be discussed by PCAOB Standard No. 1301 "Communications with Audit Committees" relating to the conduct of the audit, including any difficulties encountered in the course of the audit work, and any restrictions on the scope of activities or access to requested information, and any significant disagreements with management.

   e. Disclosures made to the Committee by the Company's CEO and CFO regarding compliance with their certification obligations as required under the Sarbanes-Oxley Act of 2002 and the rules promulgated thereunder, including the Company's disclosure controls and procedures and internal controls over financial reporting and evaluations thereof.

    f.   The effect of regulatory and accounting initiatives, as well as off-balance sheet structures on the Company's financial statements.

*     *     *

C. <u>Internal Audit Department</u>

1. Discuss the internal audit plan with the chief audit executive, including the scope, budget and qualifications of the internal audit staff, as deemed necessary.

2. Approve the appointment, performance and replacement of the chief audit executive.

3. Review significant internal audit findings with the chief audit executive, along with management's responses and follow-up to the findings, together with explanations for any significant deviations from the original plan.

D. <u>Compliance and Other Matters</u>

1. Review annually the travel and entertainment expenses of the Chairperson and President, and a summary of all other corporate officers' travel and entertainment expenses.

2. Review and discuss any reports from the Corporate Responsibility Committee, management, internal auditors, and independent auditor regarding the Company's (including its subsidiary/foreign affiliated entities) conformity with applicable legal requirements and the Company's Code of Ethics and Business Conduct Guidelines.

3. Discuss with management and the independent auditor any correspondence with regulators or governmental agencies and any published reports, which raise material issues regarding the Company's financial statements or accounting policies.

4. Establish and review procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

5. Conduct or authorize investigations into any matters within the Committee's scope of responsibilities. For that purpose, the Committee shall be empowered to retain independent counsel, accountants, or other advisors to assist in the conduct of such investigations and shall advise the Board as to the nature and extent of such investigations. The Company shall provide for appropriate funding, as determined by the Committee, for payment of compensation to the independent auditor for the purpose of rendering or issuing an audit report and to any advisors employed by the Committee.

## CODE OF ETHICS AND BUSINESS CONDUCT

47.    FMC also maintains a Code of Ethics and Business Conduct (the "Code of Conduct") which opens with remarks from Defendant Brondeau, stating that "[a]t FMC, we are committed to conducting our business with honesty and integrity and complying with all applicable laws. FMC's [Code of Conduct] exemplifies our dedication to these high business standards. The [Code of Conduct] summarizes the legal and ethical principles that we follow in our daily work and applies these principles to our policies and practices." The Code of Conduct further states, in relevant part:

**Commitment to Ethics**

Ethical behavior is an individual responsibility. Behavior reflecting high ethical standards is expected of all directors, employees and others who are bound by the [Code of Conduct], regardless of position or location. No director, officer, manager or supervisor has the authority to violate or require conduct by another employee or any other person that violates the [Code of Conduct], other FMC policies or applicable law.

The obligations in the [Code of Conduct] apply to FMC Corporation, its subsidiaries, affiliates, joint ventures and all other entities, that, in each case, are directly or indirectly controlled or managed by FMC, the employees and directors of these entities (to the extent applicable to their work for FMC) and suppliers and contractors in their work on behalf of FMC.

\*         \*         \*

2. We Comply with the Code, Other FMC Policies, and All Applicable Laws.

We comply with the [Code of Conduct], other FMC policies and all applicable laws in conducting our business. There are countries where common trading or negotiating practices are based on codes of conduct that are less stringent or different than the [Code of Conduct]. In such countries, employees should follow the [Code of Conduct], except for variances that are permitted by applicable law and are based on good ethical and business judgment. The relevant regional president or department head, or a president or vice president of FMC Corporation if no division manager is available, must approve any such variance in writing. Contact an FMC lawyer if you have any questions about the application of the law of any country, about the [Code of Conduct], or about the relation or any apparent conflict between them.

In the unusual circumstances where a waiver of the [Code of Conduct] would be appropriate for an executive officer or director, such waiver must be approved by the [Board] or a committee of the Board and promptly disclosed as required by applicable laws and regulations. In the case of all other employees, only a corporate officer, in conjunction with the General Counsel, may grant such a waiver.

*     *     *

4. We Report Suspected Non-Compliance.

Any employee who learns of a suspected violation of the [Code of Conduct] must immediately report it by following the procedure below. Employees are required to come forward with any such information without regard to the identity or position of the suspected offender.

**FMC will treat the information in a confidential manner and will ensure that no acts of retribution or retaliation will be taken against anyone for making a report in good faith.**

**Non-Compliance Reporting Procedure**

- Employee Report: Any employee who learns of a violation of the [Code of Conduct] must immediately report it.

- Investigation: It is FMC's policy and intent to investigate any reported violation of the [Code of Conduct], other FMC policy, or applicable law, and to take appropriate action, as determined by FMC, based on the results of the investigation. Reports of violations of accounting, accounting controls and audit matters will be investigated under the supervision of the Director of Internal Audit and the Audit Committee of the [Board]. All other violations will be investigated under the supervision of the Ethics Office. Employees are expected to cooperate in the investigation of reported violations.

- Confidentiality: Each investigation, all associated documents, and the identities of those involved (reporters, accused parties, investigators, participants, etc.) will be managed confidentially, securely, and on a need-to-know basis. Employees should be aware that the Ethics Office, Corporate Responsibility Committee and Audit Committee are obligated to act in the best interests of FMC and do not act as personal representatives or lawyers for the employees.

- Protection Against Retaliation: Retaliation in any form against an individual, who in good faith reports a violation of the [Code of Conduct], even if the report is mistaken, or who assists in the investigation of a reported violation, is prohibited. **Every employee**

**may report such violations without fear of retaliation by coworkers, supervisors or others that are the subject of the report.**

- Employees should refer to FMC's Ethics Response Line and Investigation Policy for further detail.

\*        \*        \*

**Discipline for Non-compliance**

Failure to comply with the [Code of Conduct] will result in disciplinary action ranging from a reprimand to dismissal. Civil or criminal violations may be prosecuted.

\*        \*        \*

18. We Do Not Engage in Insider Trading or Related Unlawful Conduct.

Employees and directors usually may buy or sell the publicly traded securities of FMC and other companies. However, U.S. law prohibits the buying and selling of publicly traded securities by a person with insider information. Even minor violations of the securities laws can have severe consequences. Penalties include forfeiture of gains, civil penalties of up to three times the profit gained or loss avoided, prison terms, and large fines.

Insider trading rules apply to all kinds of securities, including common and preferred stock, bonds, commercial paper, options, and warrants. They apply to direct buying and selling by the individual with knowledge and to tipping off a friend or family member who buys or sells.

People with inside information include:

- Officers, directors and employees of FMC who learn material, non-public information in the course of their job;

- People in a confidential relationship with FMC such as bankers, consultants and lawyers; and

- People who learn material information from a friend or acquaintance about a company with which the friend or acquaintance has a relationship. Although people may be aware of inside information about a company, the insider trading rules apply only to information that is "material." There is no definition of materiality that will apply in every case, but generally information is considered material if it can reasonably be expected to affect the market price of a company's stock. Some examples of material information are:

- Earnings information about a company;

- Plans for expansion or shut-down of facilities or significant write-offs or write-downs in the value of a company's assets;

- Certain transactions, such as mergers with other companies, acquisitions of other companies or parts of other companies, sales of all or part of a company, tender offers for or by another company; and

- Major changes in management.

Because of the severity of fines and the complexity of the applicable rules, you should contact an FMC lawyer if you have any question whether the insider trading rules apply to the purchase or sale of FMC's or any other company's securities.

FMC executive officers and directors are also prohibited from trading in FMC's publicly traded securities during any period in which participants in FMC's retirement plans could not engage in a similar type of transaction. Additional details on these restrictions are available through the General Counsel's office.

*    *    *

20. We Keep Accurate Company Records and Make Full, Fair, Accurate, Timely and Understandable Disclosures.

We make full, fair, accurate, timely and understandable disclosures in reports that FMC files under applicable laws, rules and regulations and in other public communications. Dishonest reporting, both inside and outside the company will not be tolerated. This includes reporting or organizing information in an attempt to mislead or misinform. No entry will be made on the company's books and records that intentionally hides or disguises the true nature of any transaction.

FMC has adopted controls to ensure the safeguarding of FMC assets and the accuracy of its financial records and reports in accordance with internal needs and requirements of applicable laws and regulations. These established accounting practices and procedures must be followed to assure the complete and accurate recording of all transactions. All employees, within their area of responsibility, are expected to adhere to these procedures, as directed by the appropriate FMC manager.

No employee or director may interfere with or seek to improperly influence, directly or indirectly, the auditing of FMC's financial records. Violation of these provisions shall result in disciplinary action up to and including termination, and may also subject the violator to substantial civil and criminal liability. If an employee becomes aware of any improper transaction or accounting practice, he or she must immediately report the matter as described in Section 4 of this [Code of Conduct].

Our obligation to record and report information accurately and honestly also applies to the accurate reporting of time worked, business expenses incurred, research test results and other business-related activities.

21. We Manage Our Records Properly.

To operate effectively and efficiently, records must be managed properly. Documents needed for ongoing business or required by law must be retained, while all other documents should be discarded. If excess records are not discarded, the costs and distraction of records maintenance escalates continually.

Documents should be discarded on an ongoing basis as they are no longer needed, and a general review of documents as to whether they are still needed is to be conducted at least once per year. In general, no document should be retained for more than two years unless it is needed for ongoing business or a law requires its retention. Before disposing of documents, employees and directors should consult FMC's Record Retention Policy on FMC's Intranet. Those who are unsure about the need to keep particular documents should consult with their records administrator or supervisor, so that a judgment can be made as to the likelihood that the documents will be needed. Whenever it becomes apparent that documents will be required in connection with a lawsuit or government investigation, we will preserve all possibly relevant documents and immediately suspend ordinary disposal or modification of documents pertaining to the subjects of the litigation or investigation. Under no circumstances will we alter any of these documents. If we are uncertain whether documents under our control should be preserved because they might relate to a lawsuit or investigation, we will contact the Law Department for guidance.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

48.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct alleged herein giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

49.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did deceive the investing public, including shareholders of FMC, regarding the Individual Defendants' management of FMC's operations, by and through the Individual Defendants' executive and directorial positions

at FMC and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

50.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused the Company to issue improper statements.

51.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, and to conceal adverse information concerning the Company's operations, financial condition, and business prospects.

52.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Director Defendants were a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

53.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

**SUBSTANTIVE ALLEGATIONS**

*Background*

54.     FMC, a Delaware corporation based in Philadelphia, Pennsylvania, is a global agricultural sciences company that describes itself as "the fifth largest global innovator in the agrochemicals/crop protection market." The Company manufactures, markets, and sells crop protection chemicals such as insecticides, herbicides, fungicides, and plant health products.

55.     FMC markets its products through its own sales organization and through alliance partners, wholesale distributors, and sales representatives. FMC's operations are divided into four major regions: North America; LATAM; APAC; and EMEA.

56.     Among FMC's largest revenue generators are its two diamide insecticides, Rynaxypyr and Cyazypyr, which it acquired from DuPont for $1.2 billion in 2017.

57.     The Company primarily sells Rynaxypyr and Cyazypyr directly to wholesale distributors, which then sells FMC products out of their inventories to retailers, who ultimately sell the products to farmers and other end-users.

58.     Distributors are a vital component of FMC's business because, as a manufacturer first and foremost, the Company lacks the storage and logistics networks to distribute products at scale. Moreover, distributors have extensive knowledge of regional markets as well as connections with local retailers, growers, and farmers. Accordingly, the Company maintains close, long-standing relationships with its distributors, some of whom the Company has worked with for over twenty-five years. FMC has long-term pre-payment agreements to guarantee continuous supplies of inventory. This arrangement provides the Company with extensive visibility into the inventory levels maintained by its distributors.

59.     The COVID-19 pandemic resulted in supply chain disruptions and a fear of product shortages, resulting in an increase in demand for FMC's products as distributors, retailers, and consumers stockpiled their inventories with crop production products. As a result, by 2022, FMC

and competitors saw revenues peak to record highs. Distributors, on the other hand, were left with excess inventory as a result of their increase in purchasing activity, which ultimately reduced their need for new orders, resulting in a revenue slowdown for FMC.

60.     An increase in generic competition to its crop protection products (specifically Rynaxypyr and Cyazypyr), in addition to excess inventory accumulation, also caused a downward pressure on demand for FMC during this time period, which negatively impacted FMC's sales. The extent of these challenges came to light on October 23, 2023, when the Company reported a 29 percent year-over-year decline in revenue for its third quarter of 2023 because of "channel destocking in all regions."

61.     Shortly thereafter, the Company implemented a strategic restructuring plan called "Project Focus." The goal of Project Focus was to maximize operational efficiencies, "right- size [FMC's] cost base and optimize [FMC's] footprint and organizational structure with a focus on driving significant cost improvement and productivity." FMC represented to investors, among other things, that Project Focus would result in massive cost savings that would contribute to increased future profits for the Company.

62.     During the Relevant Period, the Individual Defendants made materially false and misleading statements and omissions about the success of Project Focus, specifically as it related to the Company's efforts to stabilize its channel inventory, achieve massive cost savings, and increase productivity to foster sustainable growth. In reality, FMC's actions actively undercut these stated goals through: (1) short-sighted, manipulative sales tactics that pushed excess product into the market, inflating inventory levels the Company had publicly pledged to reduce; (2) reconfiguring and delaying returns of unused product to avoid reporting returns; (3) recording

substantial sales to high-risk, financially distressed customers; and (4) pulling sales forward to meet quarterly sales targets at the expense of later quarters.

### *Defendants' Materially False and Misleading Statements*

63. On November 16, 2023, the Company held its FMC Investor Day 2023 during which it unveiled strategic new initiatives which would later be implemented in Project Focus. During its presentation, Defendant Douglas outlined FMC's path forward, stating that "*[w]e are maintaining or gaining market share at the grower level in all regions, while continuing to see good traction for our new products*." Defendant Douglas added that "*[w]e fully expect the destocking reset is transitory, and that the channel will begin to rebalance and ease back into somewhat more normal patterns as we enter mid-2024*." The Company told investors that it expected "*$50 to $75 million in savings delivered in 2024*," and "*more than $150 million in run-rate savings by the end of 2025*."

64. Defendant Sandifer, during FMC Investor Day 2023, "share[d] some additional details given the importance of this program to our 2024 outlook," stating:

> *The restructuring program builds on a number of initiatives identified within our strategic plan, particularly with respect to two of our strategic imperatives: one, driving a competitive and resilient supply network; and two, increasing operating leverage and optimizing functional costs*. We have chosen to accelerate these actions as part of the restructuring program in order to more quickly *align FMC's cost structure to the current market realities while ensuring we remain positioned for long-term success*.
>
> Through this program, we will reduce cost and complexity as well as improve speed and efficiency. Simplification is a key theme, particularly for our back-office operations.

65. Defendant Sandifer discussed returning to normal levels, stating:

> *Our focus this coming year will be on returning working capital to more normal levels. This means converting inventory to receivables by selling product on hand, and then collecting those receivables. This further means cautiously ramping up production to keep inventory at lower targeted levels, rebuilding payables in the process.*

66.     During the question-and-answer portion of the presentation, Defendant Douglas was asked about the confidence that channel inventories would normalize in the following exchange:

[Analyst]: [Defendant Douglas], you talked a little bit earlier about your view that channel inventory levels might be below normal now at least in some regions. What gives you that visibility? Are you doing anything differently now than you have earlier in the year? And if so, what gives you that confidence?

[Defendant Douglas]: Yeah. Certainly when you think about where the industry is today, we're spending a lot more time talking to distribution, retail and where we have access to growers, talking to growers. That's happening in Asia, it's happening in Europe, certainly happening in the US and Brazil. . . . I do think there are certain places and Brazil will get to that point where we see pockets of people drawing their inventories down below normal. That's going to happen.

There are some places where it won't be below normal. But I do think in the US, we certainly know that at the grower level and at retail, the inventory levels are way below normal. But at the distribution level, as we enter the season, they're high. *So that material will flow through the channel. It's already starting to flow through the channel. So we expect that to normalize pretty quickly*.

67.     On December 18, 2023, FMC filed a Form 8-K detailing the goals of Project Focus's cost restructuring and inventory balancing plan, stating, in pertinent part:

In response to the unprecedented downturn in the global crop protection market that resulted in severe channel destocking, which has materially impacted volumes in 2023, *the Company has initiated a global restructuring plan, which we refer to as "Project Focus." This program is designed to right-size our cost base and optimize our footprint and organizational structure with a focus on driving significant cost improvement and productivity. The Company's objective for Project Focus is to deliver $50 to $75 million in contributions to adjusted EBITDA in 2024. The Company is further targeting annual run-rate savings of $150 million or more by the end of 2025 from the program once fully implemented*.

68.     On February 5, 2024, FMC issued a press release announcing its financial results for the fourth quarter and full year ended December 31, 2023 (the "4Q23 Press Release"). In the 4Q23 Press Release, FMC emphasized its "*strong results despite continued destocking*." Defendant Douglas was quoted stating that "*[d]uring the fourth quarter we observed continued*

*channel destocking in all regions*.” The 4Q23 press release further stated that “[f]irst quarter revenue is expected to be in the range of $925 million to $1.075 billion, a 26 percent decrease at the midpoint compared to first quarter 2023 *due to lower volume from destocking activity in all regions*.”

69.    The next day, on February 6, 2024, the Company hosted an earnings call for the fourth quarter of 2023 (the “4Q23 Earnings Call”) with investors and analysts. During the question-and-answer portion of the 4Q23 Earnings Call, Defendant Sandifer was asked about FMC’s working capital, particularly inventory, in the following exchange:

> [Analyst]: Okay. And then secondly, perhaps for [Sandifer], can you talk about the amount of working capital that you think you can extract in 2024, including inventory. And as you draw down inventory, what impact do you think or do you expect that will have on your earnings, if any, I imagine it creates fixed cost absorption challenge. Is that true? And how would your guide be different if you weren’t drawing down inventory, if that makes sense?

> [Defendant Sandifer]: Yes. Thanks, Kevin. Sure. I think certainly, as we’re looking to free cash flow for 2024, working capital, particularly accounts payable and to a lesser degree, inventory are really the big drivers of cash release in 2024. *And that’s in part because of an expectation as we go through the year, then we start rebalancing and production and inventory*. We have been intentionally throttling back pretty severely manufacturing over the past two quarters and well into Q1. We would expect to see some ramping back up in manufacturing activity as we go through Q2 through Q4. That will help with bringing up accounts payable.

70.    On February 27, 2024, FMC filed with the SEC a Form 10-K reporting the Company’s financial and operational results for the year ended December 31, 2023 (the “2023 10-K”). The 2023 10-K was signed by Defendants Sandifer, Brondeau, Douglas, Cordeiro, Davidson, Fortmann, Greer, Johnson, Øvrum, Pallash, and Verduin. Attached to the 2023 10-K were certifications pursuant to the Sarbanes Oxley Act of 2002 (“SOX”), signed by Douglas and Sandifer, attesting to the accuracy of the financial statements contained therein and certifying that the 2023 10-K “fully complie[d] with the requirements of Section 13(a) of the Securities Exchange Act of 1934.”

71.     The 2023 10-K described "Channel inventory behavior" as a "General Risk Factor":

Channel inventory behavior – The Company relies in many countries and in varying degrees on distribution channels to access the market and reach farmers or other end use customers. ***An abrupt and widespread shift in purchasing behaviors (e.g., the current inventory destocking phenomenon) by channel partners and end use customers has and may continue to negatively and materially impact the Company's volumes across important markets, which has adversely affected and may continue to adversely affect our results of operations***. Such adverse effects could include but not be limited to materially reduced volumes purchased by customers, resulting in not only reduced sales, but also the Company bearing higher volumes of unsold product inventory, excess raw materials, and correspondingly increased carrying costs.

72.     On March 15, 2024, FMC filed with the SEC a proxy statement on Schedule 14A (the "2024 Proxy Statement"). The 2024 Proxy Statement was solicited by Defendants Brondeau, Cordeiro, Davidson, Douglas, Fortmann, Greer, Johnson, Øvrum, Pallash, and Verduin, and called for shareholders to vote to approve, among other things: (i) the election of eleven directors, each for a term of one year; (ii) the ratification of the appointment of KPMG LLP as the Company's independent registered public accounting firm for 2024; (iii) an advisory (non-binding) vote on executive compensation; and (iv) votes on a stockholder proposal requesting simple majority vote.

73.     Regarding FMC's Code of Conduct, the 2024 Proxy Statement states:

The Company has a [Code of Conduct] that applies to all directors, officers (including its [CEO], [CFO] and Controller) and employees. It is posted on the Investor Relations page of the Company's website under "Governance — Corporate Policies" at investors.fmc.com/governance/corporate-policies/.

The Company intends to post any amendments to, or waivers from, the [Code of Conduct] required to be disclosed by either SEC or NYSE regulations on the "Governance — Corporate Policies" section of the Investor Relations page of the Company's website at investors.fmc.com/governance/corporate-policies/.

74.     Regarding the Board's role in overseeing the risk management process, the 2024 Proxy Statement stated the following, in relevant part:

As part of the Company's risk management process, the Board regularly discusses with management the Company's major risk exposures, their potential financial impact on the Company, and the steps the Company takes to manage them. The Board also reviews the designation of the management person or entity responsible for managing such risks, and evaluates the steps being taken to mitigate the risks. The Board's monitoring role is carried out by either the full Board or a Committee that reports to the Board, depending on the risk in question. The Board has determined that a separate Risk Committee is not warranted at this time.

75. The Individual Defendants caused the 2024 Proxy Statement to be false and misleading by failing to disclose that: (1) Project Focus was not succeeding in its goal of significantly lowering FMC inventory in the distribution channel; (2) FMC's channel inventories were not rebalancing or normalizing, but instead were getting worse; (3) Project Focus was failing to accelerate manufacturing cost reductions; (4) the Company's cost-plus pricing arrangements with key distributors would drastically lower FMC's revenues and profits near-term; (5) FMC's risk disclosures were materially false and misleading because they characterized as mere possibilities adverse facts that had already materialized; and (6) as a result of the above, the Individual Defendants' positive statements regarding the Company's business, operations, and prospects were materially false and/or misleading and lacked a reasonable basis at all relevant times. Further, the statements in the 2024 Proxy Statement were materially false and misleading because the Individual Defendants failed to carry out their obligations overseeing the risk management process and failed to abide by the Code of Conduct.

76. On May 6, 2024, FMC issued a press release announcing its financial results for the first quarter ended March 31, 2024 (the "1Q24 Press Release"). In the 1Q24 Press Release, Defendant Douglas was quoted as stating that "*[o]ur second quarter revenue outlook includes volume growth for the first time since global destocking began in the second quarter of 2023*." Defendant Douglas added that "[w]e expect the market to continue to improve as we progress through the year and transition to more normal conditions in 2025. *The combination of steady on-*

*the-ground application, demand for our innovative and differentiated portfolio and a more efficient cost structure places FMC in a strong position as the market recovers*."

77.    The next day, on May 7, 2024, FMC hosted an earnings call for the first quarter of 2024 (the "1Q24 Earnings Call") with investors and analysts. During the 1Q24 Earnings Call, Defendant Douglas stated that:

> *Data from third parties as well as input from our commercial teams shows that the inventory reduction actions in the channel are making good progress*.
>
> On a regional basis, the pace of destocking is varied. We see North America furthest along, with inventories at the retail and grower level back to normal, while distributors are still working to reduce their level of inventory. EMEA is in a similar condition, except in countries hit by unfavorable weather. *In both these geographies, our customers are now targeting to operate with inventories at lower-than-normal levels*. In Latin America, *inventories are materially lower and are expected to trend towards more normal levels as we move through the rest of the year*. We expect India destocking to persist well into 2025, but parts of Asia, such as ASEAN and Pakistan, have made strong progress in destocking in Q1.
>
> *While these activities continue to run their course, we're encouraged by the first signs that customers are starting to return to historical order patterns*. In North America, we continue to receive orders for products that will be used early in the current season, which indicates that the inventories of such products have now been depleted. In Brazil, customers are now discussing next season's volumes, providing visibility that we did not have last year. *Our full year outlook assumes that the market improves as the year progresses, but the customers will seek to hold lower levels of inventory*.
>
> We are forecasting our second quarter results to be similar to the prior year. Sales are expected to be between $1 billion and $1.15 billion, which represents a year-on-year growth of 6% at the midpoint, driven by higher volume. *This is the first quarter during which we expect to report an improvement in year-over-year volume since the start of global destocking*. Price is anticipated to be a headwind in the low- to mid-single digits and the FX outlook is neutral.
>
> *                *                *
>
> *EBITDA in the second quarter is expected to be between $170 million and $210 million, up 1% versus the prior year at the midpoint*. At the EBITDA midpoint, we expect that volume growth and restructuring benefits will be offset by lower price and COGS headwinds.

Adjusted earnings per share is expected to be between $0.43 and $0.72, an increase of 15% at the midpoint, due mainly to lower interest expense and D&A.

78.    During the question-and-answer portion of the 1Q24 Earnings Call, Defendant Douglas was asked by an analyst about FMC's "internal inventory" and "where you are now versus where you would like inventories to be." Defendant Douglas, in response, touted the success of FMC's sales and inventory reduction efforts, stating that "we peaked inventory basically around about August last year internally. And *we've been obviously on the track since we first came into this channel destocking to really remove inventory as fast as we could. We're getting close to the point. We're not quite there yet. We're getting close to the point where at the macro level for our inventory, we're going to be pretty much where we want to be*." Defendant Douglas continued, stating, "*I would say by the time we get through Q2 and into Q3, we're going to be in pretty good shape in terms of where our revenue is reset this year versus where the inventory needs to be*."

79.    During the question-and-answer portion of the 1Q24 Earnings Call, an analyst asked Defendant Douglas about the normalization of FMC's channel inventory following destocking, in the following exchange:

[Analyst]: As inventory destocking comes to an end and as you get into 2025, like, how do you see volume grow for the portfolio in 2025 and 2026?

[Defendant Douglas]: Yeah. Listen, as we go through 2025, I think we've said that we expect what we would consider a more normal type of growth for the marketplace. Acres continue to grow, certainly, in Latin America and Brazil, so we expect that to be a driver. And don't forget, *at that point, people will be then resetting from a lower level of inventory. So, you would expect more of a normal market growth*. Typical market like this grows at anywhere from 2% to 3% per annum, and we generally speaking with our differentiated portfolio, outgrow the market in the long haul.

So, I think it's more about a normalized market. *Demand on the ground, as we said, even in these conditions, is very good, we expect that to continue. As pressure continues to change, so we see that market piece as being pretty robust*.

Obviously, our NPIs are growing rapidly, so we would expect 2025 and 2026 to be actually faster than the growth we see in 2024.

And then, the other piece of which is not really market driven, but just a view of 2025, we have a lot of cost headwinds flowing against us right now that are obviously depressing our EBITDA and our EBITDA margin. ***Those turn into tailwinds as we go into next year and I think it's an important facet as we walk through the next couple of earnings calls, as we build out the picture of what 2025 is going to look like, you certainly have got a more stable, more robust external market***. But we also have some pretty significant tailwinds in the sense of how we think about our P&L.

80.     During the question-and-answer portion of the 1Q24 Earnings Call, an analyst asked Defendant Sandifer if FMC's cash flow was expected to "be more back half weighted in 2024." Defendant Sandifer affirmed this expectation, stating that "essentially all of the positive free cash flow for the year is going to come in the second half" and that:

> ***What we are carefully balancing is continuing to bring down our absolute level of inventory while selling through at the higher rate we're expecting to sell in the second half new production***. So, it will be a staggered step as we go through the rest of the year to bring payables back up to a more reasonable level and to get inventory again a couple hundred million less than where we are today. So, that will be the combination of those two and it really will take through the full second half to get the cash benefit from those actions.

81.     Also on May 7, 2024, the Company filed with the SEC a Form 10-Q reporting the Company's financial results for the first quarter of 2024 (the "1Q24 10-Q"). The 1Q24 10-Q filing included SOX certifications, signed by Defendants Douglas and Sandifer, attesting to the accuracy of the financial statements contained therein and certifying that the Q1 2024 10-Q "fully complie[d] with the requirements of Section 13(a) of the Securities Exchange Act of 1934."

82.     In the Q1 2024 10-Q, FMC stated that:

> We expect 2024 free cash flow (Non-GAAP) to fall within a range of approximately $400 million to $600 million. At the mid-point of the range, ***there is a significant increase year over year driven largely by the rebuilding of payables and lower inventory***. . . . In response to the unprecedented downturn in the global crop protection market that resulted in severe channel destocking, we initiated the Project Focus global restructuring plan. ***This program is designed to right-size our***

*cost base and optimize our footprint and organizational structure with a focus on driving significant cost improvement and productivity*.

83.     On May 15, 2024, FMC participated in the BMO Global Farm to Market Conference. In his opening remarks, Defendant Douglas stated the following regarding FMC's channel inventory levels:

I think many of you are aware of all the issues we've had coming out of COVID with supply chains, with destocking. That's something that's on everybody's mind. Certainly is on Andrew and I's – with my mind, I think *as we go through the rest of this year and as we certainly go into 2025, you're going to start to see a more normalization*. It's not going to be smooth. It's going to be bumpy. *But we're getting to the end of this destocking period, and I think that's an important facet for investors to recognize that supply chains can't empty forever and they have to replenish. That's the phase we're in now. We call it a transition this year. I think that's an apt description*.

84.     During the question-and-answer portion of the conference, Defendant Douglas responded to a question about the Company's channel inventory levels in various regions in the following exchange:

[Analyst]: Why don't we talk about more regional, so we're talking more broad and maybe you can break down each region and talk about where the – how we're flipping from destocking to restocking? And how you see inventories in each region right now.

[Defendant Douglas]: Yeah, I think I think there's been a lot of commentary around the different regions of the world. North America is probably the furthest along, was one of the first regions to get hit by this change. I would say, distribution still a little high, retail and grower is very low. So *North America is in pretty good shape. Europe's the next that is going through their season now*. So they started to deplete last year. Depleting a lot more now. Asia is a mixed bag. India inventories are very high, that – we have high inventory, others in the industry have high inventory. That's mainly due to weather, though not necessarily the same dynamics as we see in the rest of the world. And then Latin America I mean, Latin America is finishing its season now. It's not bad. It's not exactly where it should be, but it's getting there. *So as we roll into the 2024-2025 season in Q4 this year, it'll be in much better shape*.

85.    On June 11, 2024, FMC participated in the 2024 Wells Fargo Industrials Conference. In his opening remarks, Defendant Sandifer made the following statements about FMC's channel inventory levels:

*We're actually sitting in places where inventories are well below what has been historically held in the channel*. And we have a few places where we're a little slow to meet an order occasionally because we don't always have every single product on the shelf someone might want. There's a reason these products are carried in inventory during a growing season.

The demand for them can be fickle and hard to predict. When bugs show up in your field, you need an insecticide today. Not two weeks from now, not five weeks from now, you need it today. *So we are seeing these things rebalance*. The timing and the magnitude of that rebalancing $324 million is a bit, it is a complicated issue we're working through. *But I think fundamentals here, the in market demand is still strong as the channel inventory corrects. And we get more in sync the flow from manufacturers through the distribution channel into the grower hands, we will see a rebalancing and a rebasing of the business*.

And that's where we see a pivot back to FMC of all in terms of our ability to drive growth with technology, with differentiation and with a closeness to customers and there's certainly places we can put down here on all those topics.

86.    During the question-and-answer portion of the conference, Defendant Sandifer responded to a question about the Company's channel inventory levels in the following pertinent exchange:

[Analyst]: So as we enter 2025, the expectation is that inventories at that point should be at a place where?

[Defendant Sandifer]: Yeah, I think as we move into 2025, look I'm very careful about using the word normal because we've been through a period in the last five years. And I think anybody who tries to define normal at this point to fool's game. *What we are seeing is improving conditions. We are seeing channel inventories reduce, we will see a rebalancing, a resining of pull through by growers from all the way back up channel back to manufacturers where that's been broken in the past four quarters as that channel, the inventory that built up in between needed to be drawn down*.

87.    That same day, June 11, 2024, FMC announced that Defendant Douglas had resigned from his roles as President, CEO, and Board member of FMC and that Defendant

Brondeau had been appointed by the Board to succeed Douglas as CEO. In addition, the Board appointed Ronaldo Pereira to succeed Defendant Douglas as president of FMC.

88.     On July 31, 2024, FMC issued a press release announcing its financial results for the second quarter ended June 30, 2024 (the "2Q24 Press Release"). In the 2Q24 Press Release, new CEO Defendant Brondeau was quoted as stating: "*[d]emand improved during the second quarter*, resulting in a pronounced increase in [FMC's] sales volumes, most notably within the United States and Brazil, *despite customers continuing to actively manage inventory*." Defendant Brondeau also stated that "*[FMC] expect[s] demand to increase as the year progresses even as customers maintain a careful approach of managing inventory*."

89.     The next day, on August 1, 2024, the Company filed with the SEC a Form 10-Q reporting the Company's financial results for the second quarter of 2024 (the "2Q24 10-Q"). The 2Q24 10-Q included SOX certifications, signed by Defendants Brondeau and Sandifer, attesting to the accuracy of the financial statements contained therein and certifying that the 2Q24 10-Q "fully complie[d] with the requirements of Section 13(a) of the Securities Exchange Act of 1934." In the 2Q24 10-Q, FMC stated that it had been implementing Project Focus's restructuring plan "*to right-size our cost base and optimize our footprint and organizational structure with a focus on driving significant cost improvement and productivity*" and that "*[w]e expect the plan to be fully executed by the end of 2025*."

90.     That same day, FMC hosted an earnings call for the second quarter of 2024 (the "2Q24 Earnings Call") with investors and analysts. During the 2Q24 Earnings Call, Defendant Brondeau stated that:

> We delivered a solid Q2, helped by the successful execution of our restructuring program. *We expect continued growth in Q3 and Q4 from demand recovery, led by the Americas, where we expect channel inventory to approach normal levels by year-end*. Q2 through Q4 all *show higher revenue driven by volume*, with the

rate of growth accelerating in Q4 as we shift into the next crop season. ***The markets have begun to recover as channel inventories are starting to normalize, even if not as fast as we had previously expected***. We plan for FMC's pace of revenue and earnings growth to accelerate through the rest of 2024 and throughout 2025.

91.    On October 29, 2024, FMC issued a press release announcing its financial results for the third quarter ended September 30, 2024 (the "3Q24 Press Release"). In the 3Q24 Press Release, Defendant Brondeau was quoted stating, "***[s]trong volume growth in Latin America and North America*** more than offset lower pricing, particularly in Brazil and Argentina which accounted for two-thirds of the total company price decline. ***Despite suboptimal market conditions, we saw increased demand for new products***, specifically fluindapyr-based fungicide products, which confirms the strength of FMC's innovation pipeline." The 3Q24 Press Release further stated that "***[r]evenue growth in the quarter of 9 percent was driven by a 17 percent increase in volume***, with some North America second half orders occurring earlier than expected ***due to improved channel inventory levels***."

92.    On October 30, 2024, the Company filed with the SEC a Form 10-Q reporting the Company's financial results for the third quarter of 2024 (the "3Q24 10-Q"). The 3Q24 10-Q included SOX certifications, signed by Defendants Brondeau and Sandifer, attesting to the accuracy of the financial statements contained therein and certifying that the 3Q24 10-Q "fully complie[d] with the requirements of Section 13(a) of the Securities Exchange Act of 1934."

93.    In the 3Q24 10-Q, FMC stated that it had been implementing Project Focus's restructuring plan "***to right-size our cost base and optimize our footprint and organizational structure with a focus on driving significant cost improvement and productivity***" and that "***[w]e expect the plan to be fully executed by the end of 2025***."

94.    That same day, FMC hosted an earnings call for the third quarter of 2024 (the "3Q24 Earnings Call") with investors and analysts. In his opening remarks, Defendant Brondeau addressed the Company's quarterly results:

> ***Overall, we reported a strong third quarter with growth at the top and bottom line***. The quarter unfolded mostly as expected in Europe and Asia. However, ***we operated in a weaker-than-expected market landscape in Latin America***, which was offset by a stronger-than-anticipated performance in North America.
>
> ***Latin America faced some unanticipated challenges this quarter, but we still delivered growth. Markets in Brazil and Argentina were more challenging than expected due to the delayed rains and increased borrowing rates. The bankruptcy of a large customer in Brazil added specific challenges for FMC. Given that we believe we are only a couple of quarters away from a more normal market situation, we decided to take pricing actions to maintain our market position***. In fact, about two-thirds of the total company price decline in the quarter came from Brazil and Argentina. The rest of the region performed at or above expectations. While conditions are improving, it's clear that Latin America has not yet emerged from the down cycle as distributors and growers continue to manage their inventories carefully.
>
> *    *    *
>
> Looking ahead, ***our view on the timeline of channel inventory recovery is relatively unchanged from what we communicated during our August earnings call***. The U.S. and most countries in Europe are normalizing the fastest and Latin America is expected to be much improved in the second quarter of 2025. Asia markets are still expected to be very challenging in 2025 with no recovery expected until 2026 as India continues to work through excess channel inventory.
>
> ***On a cost basis, we are accelerating the delivery of savings and increasing our targets***. We are now targeting cost benefits from restructuring of $125 million to $150 million to be reflected in the P&L in 2024, with greater than $225 million of gross run-rate in 2025. To accomplish this, we are accelerating restructuring, taking new critical initiatives to realign our manufacturing footprint, and using attrition as a key tool to drive further savings.

95.    On December 4, 2024, the Company participated in the Goldman Sachs Industrials and Materials Conference. During the question-and-answer portion of the conference, Defendant Brondeau responded to a question asking about the Company's channel inventory in the following exchange:

[Unidentified speaker]: When you look at kind of the high watermark for that inventory and where you think you're at today with your products through the chain, how would you categorize the delta? Are you where you want to be all the way through the chain, or do you think there's still some more inventory to come out?

[Defendant Brondeau]: I think it's very region dependent. *We are pretty comfortable with North America and Europe. Things are happening well in Latin America and Brazil, Argentina, where we see product going through the channel with the season, which is turning out despite the delay in rain, pretty good. So we believe Latin America will get by a normalized channel toward the second quarter*.

96.     The above statements were false and/or materially misleading when made because they failed to disclose the following adverse facts: (i) FMC's Project Focus was not succeeding in its goal of meaningfully lowering FMC inventory in the distribution channel; (ii) FMC's channel inventories were not rebalancing or normalizing, and in fact, were getting worse as a result of Defendants' own undisclosed sales practices; (iii) FMC had inflated short-term revenues by engaging in manipulative sales practices; (iv) Project Focus was lagging in its goal of accelerating manufacturing cost reductions; (v) FMC's pricing arrangements with key distributors would significantly lower FMC's revenues and profits in the near-term; (vi) FMC's risk disclosures were materially false and misleading because they characterized as mere possibilities adverse facts that had already materialized; and (vii) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading or lacked a reasonable basis.

***The Truth Emerges***

97.     On February 4, 2025, FMC issued a press release announcing its financial results for the fourth quarter 2024 (the "4Q24 Press Release"). In the 4Q24 Press Release, FMC revealed that it had missed its previously announced full fiscal year revenue guidance as well as consensus revenue estimates by $90 million. Defendant Brondeau was quoted in the 4Q24 Press Release,

stating, "[w]hile we saw a good increase in volume, *the growth was below our expectations as we learned during the quarter that customers in many countries sought to hold significantly less inventory than they have historically*." Specifically, sales in FMC's most significant region—Latin America—were down 10%. The Company also provided a Full Year 2025 outlook, disclosing that it expected revenue to remain essentially flat due to "*weaker demand in the channel as customers in many countries prioritize holding lower-than-historical levels of inventory*." In relevant part, the 4Q24 Press Release stated:

**FMC Corporation announces 2024 fourth quarter and full year results, provides 2025 outlook**

Fourth quarter results benefited from 7 percent sales growth and continued cost favorability; Company reported strong year of cash generation with over $1 billion improvement in Cash from Operations

\* \* \*

**Full-Year 2024 Highlights**

- Revenue of $4.25 billion lower by 5 percent versus prior year and down 3 percent organically

- Consolidated GAAP net income of $342 million, down 74 percent versus 2023

- Adjusted EBITDA of $903 million, down 8 percent versus 2023

- Consolidated GAAP earnings of $2.72 per diluted share, down 74 percent versus 2023

- Adjusted earnings of $3.48 per diluted share, down 8 percent versus 2023

- Consolidated GAAP cash flow from operations of $737 million, an increase of $1.04 billion versus 2023

- Free cash flow of $614 million, an increase of $1.14 billion versus 2023

\* \* \*

"*While we saw a good increase in volume, the growth was below our expectations as we learned during the quarter that customers in many countries sought to hold*

*significantly less inventory than they have historically*. This dynamic, along with more pronounced FX impacts, acted as a headwind to further growth. Over seventy-five percent of our sales growth came from our growth portfolio. This, together with continued cost discipline, was a key factor in delivering a strong year-over-year increase in adjusted EBITDA, which was above our guidance midpoint."

98.     That same day, FMC hosted an earnings call for the fourth quarter of 2024 (the "4Q24 Earnings Call") with investors and analysts. During the 4Q24 Earnings Call, Defendant Brondeau stated:

> *I have modified my view of what needs to be done for FMC* to fully benefit from the market upturn when it happens, and the quality of our portfolio. *The company needs a stronger reset than what I thought initially*. We learned a lot in the fourth quarter, and it has become clear that *we need to take more aggressive actions to reposition FMC. Above all, we need to significantly lower FMC inventory in the channel, much beyond what we were expecting*. We also need to give a higher priority to the implementation of our newly developed strategy for Rynaxypyr® and Cyazypyr®, including accelerating the implementation of our manufacturing cost reduction efforts.
>
> *These actions will have a pronounced negative impact on 2025 financial performance beyond what we anticipated*.
>
> \*     \*     \*
>
> [W]e saw lower-than-expected demand across most regions as customers lowered the amount of inventory they were willing to hold versus historical levels. While we did anticipate customers would hold less inventory in an environment of higher interest rates, lower commodity prices and a perception of secure supply, we were not expecting behavior to change to such a degree.
>
> Given the above assumptions, and the current high levels of FMC product in the channel, *we now believe we have elevated channel inventories in some countries in LATAM, including Brazil; Asia, including India; as well as Canada and Eastern Europe*.

99.     The 4Q24 Press Release and statements made by the Individual Defendants during the 4Q24 Earnings Call contradicted statements made earlier by them. During those earlier statements, Defendants portrayed a false impression of Project Focus's success and the Company's related efforts to balance its channel inventory, achieve cost savings, and increase productivity to foster sustainable growth.

100.     On this news, FMC's share price declined approximately 33.5%, from a closing price of $54.04 on February 4, 2025, to a closing price of $35.92 per share on February 5, 2025, eradicating over $2 billion in market capitalization in one day.

## THE INDIVIDUAL DEFENDANTS CAUSED THE COMPANY TO REPURCHASE ITS OWN STOCK AT INFLATED PRICES

101.     During the Relevant Period, in breach of their fiduciary duties to FMC, and in violation of federal securities laws, the Individual Defendants caused the Company to repurchase its own shares at artificially inflated prices, causing substantial damage to the Company. In total, the Company expended over $5.2 million repurchasing approximately 108,056 shares of its own common stock at prices that did not reflect the actual value of the stock. As a result, FMC overpaid for repurchases during the Relevant Period.[1]

102.     The Company repurchased the following amount of stock during the Relevant Period:

| Date Range | Repurchased Shares | Average Price Per Share | Approximate Aggregate Cost |
|---|---|---|---|
| November 1 - 30, 2023 | 882 | $53.43 | $47,125.26 |
| December 1 - 31, 2023 | 726 | $55.88 | $40,568.88 |

---

[1] When an employee's restricted stock units vest, the employee owes taxes on those stock units. Further, when an employee exercises a stock option, there are costs associated, such as paying the exercise price. Instead of incurring these costs, FMC allows employees to relinquish their stock, the amount of which is based on FMC's stock price. The greater the stock price, the less stock the employee has to relinquish. In the case of relinquishing the stock for tax purposes, FMC must then pay the actual taxes owed to the respective taxing authorities - in cash, not stock. The amount FMC pays is based on the value at the time of the relinquishment of the stock, therefore, even if its stock price goes down, FMC is on the hook for the cash payment to the government. As a result, when FMC's stock price is inflated and an employee relinquishes stock to the Company, FMC is damaged in two ways. First, the Company receives less stock than it should. Second, the Company pays more taxes than it should and does not receive stock worth that corresponding amount. The expense to the Company from this program is substantial. The Company accounts for the relinquishment of the stock as an expense in its financial statements, categorizing it as a repurchase of stock.

| | | | |
|---|---|---|---|
| January 1 - 31, 2024 | 1,482 | $57.95 | $85,881.90 |
| February 1 - 29, 2024 | 31,033 | $52.44 | $1,627,370.52 |
| March 1 - 31, 2024 | 7,306 | $59.63 | $435,656.78 |
| April 1 - 30, 2024 | 930 | $57.84 | $53,791.20 |
| May 1 - 31, 2024 | 1,977 | $64.42 | $127,358.34 |
| June 1 - 30, 2024 | 791 | $56.28 | $44,517.48 |
| July 1 - 31, 2024 | 2,181 | $58.07 | $126,650.67 |
| August 1 - 31, 2024 | 2,024 | $61.46 | $124,395.04 |
| September 1 - 30, 2024 | 5,288 | $65.87 | $348,320.56 |
| October 1 - 31, 2024 | 635 | $62.33 | $39,579.55 |
| November 1 - 30, 2024 | 1,401 | $56.65 | $79,366.65 |
| December 1 - 31, 2024 | 935 | $49.96 | $46,712.60 |
| January 1 - 31, 2025 | 3,293 | $55.26 | $181,971.18 |
| February 1 - 31, 2025 | 36,847 | $38.10 | $1,403,870.70 |
| March 1 - 31, 2025 | 6,328 | $36.73 | $232,427.44 |
| April 1 - 31, 2025 | 3,909 | $39.77 | $155,460.93 |
| May 1 - 31, 2025 | 35 | $42.15 | $1,475.25 |
| June 1 – 31, 2025 | 53 | $42.73 | $2,264.69 |
| **Total** | **108,056** | | **$5,204,765.62** |

103.    As a result of these repurchases, the Company overpaid by approximately $5.2 million for repurchases of its own common stock during the Relevant Period.

**DAMAGES TO FMC**

104.    As a direct and proximate result of the Individual Defendants' misconduct, FMC has expended and will continue to expend significant sums of money.

105.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution or to satisfy a judgement associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

106.    Such expenditures will also include costs incurred in any internal investigation pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

107.    Such expenditures also include the waste of FMC's assets as a result of the Individual Defendants' misconduct, which has and will continue to cause the Company to needlessly incur substantial economic and reputational harm, and to incur a significant loss in market capitalization, financial integrity, reputation, and credibility.

108.    The Individual Defendants' wrongful conduct has and will continue to cause FMC to waste resources from costs incurred from compensation and benefits paid to the Individual Defendants who have breached their fiduciary duties to FMC.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

109.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

110.    Plaintiff brings this action derivatively in the right and for the benefit of FMC to redress injuries suffered, and to be suffered, by FMC as a direct result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets, unjust enrichment, as well as the aiding and abetting thereof, and violations of the federal securities laws.

111.    Plaintiff has continuously owned FMC common stock at all relevant times.

112.    Plaintiff will adequately and fairly represent the interests of FMC and its shareholders in enforcing and prosecuting her rights and has retained counsel competent and experienced in derivative litigation.

113.    FMC is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

114.    A pre-suit demand on the Board is futile and therefore excused. At the time this action commenced, the Board consisted of the following nine directors: Defendants Brondeau, Cordeiro, Davidson, Fortmann, Johnson, and Verduin (the "Director Defendants"), as well as Non-Parties Barry, Merkt, and Raines. All nine members of the Board are incapable of exercising

independent objective judgment and/or making an independent and disinterested decision about whether to institute and vigorously prosecute this action.

### *Demand is Futile as to the Director Defendants*

115. The Director Defendants all face a substantial likelihood of liability for their individual misconduct as they were directors during the time of the false and misleading statements and as such had a fiduciary duty to ensure that FMC's SEC filings, press releases, and other public statements and presentations on behalf of FMC concerning its business, operations, prospects, internal controls, and financial statements were accurate.

116. The Director Defendants breached their fiduciary duties of care, loyalty, good faith, and candor by causing, authorizing, or permitting FMC to issue materially false and misleading public statements and omissions concerning: (i) Project Focus's efforts in lowering FMC's inventory in the distribution channel; (ii) the rebalancing or normalization of FMC's channel inventories; (iii) Project Focus's efforts to accelerate manufacturing cost reductions; (iv) FMC's cost-plus pricing arrangements with distributors; and (v) FMC's risk disclosures.

117. The conduct of the Director Defendants alleged herein constitutes knowing and culpable violations of their obligations as officers and directors of FMC, reflects an absence of good faith, and demonstrates a reckless disregard for their duties to the Company. The Demand Board was aware, or reckless in not being aware, that this posed a risk of serious injury to the Company.

118. The Director Defendants knowingly and consciously authorized or permitted FMC to issue false and misleading statements, failed to timely correct such statements, failed to take necessary and appropriate steps to ensure that FMC's internal controls were sufficiently robust and

effective, and failed to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence.

119. As alleged above, the Director Defendants have breached their fiduciary duties to FMC and its stockholders and have violated state and federal laws. As a result of their misconduct, the Company now possesses valuable claims against the Individual Defendants for breaching their fiduciary duties of care and loyalty (and the duty of disclosure derived therefrom). Finally, the Company has claims against the Director Defendants for their unjust enrichment by the compensation and director remuneration at the expense of and to the detriment of FMC.

120. Demand is futile because the Director Defendants cannot impartially consider whether FMC should pursue claims arising from the misconduct alleged herein. Doing so would expose the Director Defendants to significant liability and, as such, demand on the Director Defendants is futile.

121. Demand upon Defendant Brondeau is futile and excused. Defendant Brondeau has served as FMC's CEO since June 2024 and as Chairman of the Board since 2010. Brondeau personally made numerous materially false and misleading statements alleged herein, and FMC has admitted in its SEC filings that Defendant Brondeau is not an independent director for purposes of demand futility. Brondeau also signed or authorized FMC's public filings and participated in soliciting the false and misleading 2024 Proxy Statement. Additionally, Defendant Brondeau's roles within FMC are his principal occupation, for which he receives significant compensation. As Chairman of the Board, Defendant Brondeau conducted little, if any, oversight of the Company's issuance of false and misleading statements and consciously disregarded his duties to protect FMC's corporate assets. As such, Defendant Brondeau breached his fiduciary duties, faces a

substantial likelihood of liability, is not independent or disinterested and, therefore, demand upon him is futile and excused.

122. Demand upon Defendant Cordeiro is futile and excused. Defendant Cordeiro has served as FMC director since 2011, and he served as Chair of the Audit Committee throughout the Relevant Period. As Chair of the Audit Committee, Cordeiro was specifically responsible for overseeing the integrity of FMC's financial statements and public reporting; reviewing and discussing FMC's earnings releases, Forms 10-K, Forms 10-Q, and related disclosures; monitoring FMC's compliance with legal and regulatory requirements; and reviewing management's processes for identifying and controlling material financial and operational risks. FMC publicly represents that its Audit Committee reviews earnings releases and periodic SEC filings and is responsible for ensuring that the Company's financial reports fairly represent its operations. Moreover, as a Company director, Defendant Cordeiro conducted little, if any, oversight of the Company's issuance of false and misleading statements and consciously disregarded his duties to protect FMC's corporate assets. In exchange for these services, Defendant Cordeiro receives significant compensation from the Company. Despite those responsibilities, Defendant Cordeiro signed FMC's 2023 Form 10-K, participated in soliciting the false and misleading 2024 Proxy Statement, and authorized or permitted FMC to continue issuing the materially false and misleading statements alleged herein. As such, Defendant Cordeiro breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, therefore, demand upon him is futile and excused.

123. Demand upon Defendant Davidson is futile and excused. Defendant Davidson has served as a Company director since 2020 and, during the Relevant Period, served as member of the Audit Committee and as Chair of the Nominating and Corporate Governance Committee. In

those capacities, Davidson was responsible for reviewing FMC's financial reporting and public disclosures, monitoring material financial and operational risks, overseeing FMC's corporate-governance practices, and evaluating whether the Board and its committees were effectively discharging their responsibilities, in exchange for which he receives significant compensation from the Company. Despite those responsibilities, Defendant Davidson signed FMC's 2023 Form 10-K, participated in soliciting the false and misleading 2024 Proxy Statement, and authorized or permitted FMC to continue issuing the materially false and misleading statements alleged herein. As such, defendant Davidson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, therefore, demand upon him is futile and excused.

124.    Demand upon Defendant Fortmann is futile and excused. Defendant Fortmann has served as a Company director since 2022, and during the Relevant Period, served on the Compensation and Human Capital Committee and the Nominating and Corporate Governance Committee. As a member of the Compensation and Human Capital Committee, Fortmann was responsible for reviewing and approving the performance goals used to determine executive compensation, evaluating FMC's executive officers against those goals, and approving compensation purportedly tied to the Company's financial and operational performance. As a member of the Nominating and Corporate Governance Committee, she also participated in overseeing the Board's governance practices, committee composition, and annual evaluation processes. In exchange for these services, she receives significant compensation from the Company. Despite those responsibilities, Defendant Fortmann signed FMC's 2023 Form 10-K, participated in soliciting the false and misleading 2024 Proxy Statement, and authorized or permitted FMC to continue issuing the materially false and misleading statements alleged herein.

As such, Defendant Fortmann breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, therefore, demand upon her is futile and excused.

125. Demand upon Defendant Johnson is futile and excused. Defendant Johnson has served as a Company director since 2013, and she served as Chair of the Compensation and Human Capital Committee, and as a member of the Executive Committee, throughout the Relevant Period. As Chair of the Compensation and Human Capital Committee, Johnson was responsible for establishing and approving the performance objectives applicable to FMC's senior executives, evaluating those executives' performance, and determining the compensation paid to them. As an Executive Committee member, Johnson was also authorized to act in place of the full Board when the Board was not in session. In exchange for these services, she receives significant compensation from the Company. Despite those responsibilities, Defendant Johnson signed FMC's 2023 Form 10-K, participated in soliciting the false and misleading 2024 Proxy Statement, and authorized or permitted FMC to continue issuing the materially false and misleading statements alleged herein. As such, Defendant Johnson breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, therefore, demand upon her is futile and excused.

126. Demand upon Defendant Verduin is futile and excused. Defendant Verduin has served as a Company director since 2023, and she served during the Relevant Period on the Compensation and Human Capital Committee, as well as the Sustainability Committee. In exchange for these services, she receives significant compensation from the Company. Despite those responsibilities, Defendant Verduin signed FMC's 2023 Form 10-K, participated in soliciting the false and misleading 2024 Proxy Statement, and authorized or permitted FMC to continue issuing the materially false and misleading statements alleged herein. As such, Defendant

Verduin breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, therefore, demand upon her is futile and excused.

127. Accordingly, at least six of the nine members of the Demand Board face a substantial likelihood of personal liability arising from the misconduct that would be the subject of any demand. Because a majority of the Demand Board cannot impartially and disinterestedly consider whether FMC should pursue the claims asserted herein, pre-suit demand is futile and excused.

### *Demand Is Futile as to Non-Parties Barry, Merkt, and Raines*

128. Demand upon Non-Party Barry is futile and excused. Barry has served as a Company director since February 2026 for which he receives significant compensation from the Company. As such, Barry cannot independently or impartially consider any demand adverse to a Demand Board member serving on the Compensation and Human Capital Committee who determine Barry's compensation. Barry therefore could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Barry is thus futile and excused.

129. Demand upon Non-Party Merkt is futile for the following reasons. Merkt has served as a Company director since April 2025 for which he receives significant compensation from the Company. As such, Merkt cannot independently or impartially consider any demand adverse to the Demand Board serving on the Compensation and Human Capital Committee who determine Merkt's compensation. Merkt therefore could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Merkt is thus futile and excused.

130. Demand upon Non-Party Raines is futile for the following reasons. Raines has served as a Company director since 2024 for which he receives significant compensation from the

Company. As such, Raines cannot independently or impartially consider any demand adverse to the Demand Board serving on the Audit Committee. Raines therefore could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Raines is thus futile and excused.

### *Additional Reasons Demand Is Futile*

131. Defendants Cordeiro and Davidson, and Pallash served as members of the Audit Committee during the Relevant Period. As described in detail above, the Audit Committee is required to oversee the accounting and financial reporting processes of FMC and the audits of the financial statements of the Company, and otherwise meet their responsibilities as set forth in the Audit Committee Charter. In violation of the charter, the Audit Committee Defendants failed to adequately exercise their risk management and risk assessment obligations; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, defendants Cordeiro and Davidson further breached their fiduciary duties, are not disinterested, thus, demand is futile and excused as to them.

132. As a direct result of the misconduct alleged herein, FMC has incurred, and will continue to incur, substantial losses, liabilities, and expenses. Nevertheless, the Demand Board has not caused the Company to investigate or pursue claims against the Individual Defendants to recover the damages sustained by FMC.

133. 138. As alleged herein, a majority of the Demand Board caused, authorized, or consciously failed to prevent FMC from issuing materially false and misleading public statements and failed to take appropriate corrective action after the underlying misconduct became known. Those directors also failed to ensure that the Company maintained adequate disclosure controls, complied with applicable law and the Code of Conduct, and accurately reported material

information concerning FMC's operations, channel inventory, pricing practices, and financial prospects. Accordingly, a majority of the Demand Board faces a substantial likelihood of liability for non-exculpated breaches of the fiduciary duties of loyalty and good faith and cannot impartially consider whether FMC should pursue the claims asserted herein.

134.    139. Certain members of the Demand Board also received compensation and other benefits during the Relevant Period that Plaintiff alleges were awarded or retained while those directors were breaching their fiduciary duties. To the extent FMC's claims seek disgorgement or restitution of such compensation, those directors would be required to determine whether the Company should pursue recovery directly from themselves, further impairing their ability to consider a demand impartially and disinterestedly.

135.    140. The misconduct alleged herein was not the product of a valid exercise of business judgment, but instead involved knowing, bad-faith, or disloyal conduct that is not subject to exculpation under FMC's governing documents or applicable Delaware law. Because a majority of the Demand Board faces a substantial likelihood of personal liability on the non-exculpated claims asserted herein, that majority is interested in the subject matter of any demand and cannot exercise independent and disinterested judgment regarding whether FMC should pursue those claims. Accordingly, pre-suit demand is futile and excused.

136.    Publicly traded companies, such as FMC, typically carry director and officer liability insurance from which FMC could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover FMC's damages. If no such insurance is carried, then the Demand Board will not cause FMC to sue the Individual

Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event.

137.    Accordingly, each of the members on the Demand Board, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence. As such, any demand upon the Demand Board is excused as being futile.

138.    Accordingly, Plaintiff properly brings this derivative action.

## CLAIMS FOR RELIEF

## CLAIM I

**Against the Individual Defendants for Violation of Section 14(a) of the Exchange Act and Rule 14a-9**

139.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

140.    Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title."

141.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading. 17 C.F.R. § 240.14a-9.

142.    Defendants Brondeau, Cordeiro, Davidson, Douglas, Fortmann, Greer, Johnson, Øvrum, Pallash, and Verduin negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements in the 2024 Proxy Statement, which solicited stockholder votes to approve: (i) the election of eleven directors, each for a term of one year; (ii) the ratification of the appointment of KPMG LLP as the Company's independent registered public accounting firm for 2024; (iii) an advisory (non-binding) vote on executive compensation; and (iv) votes on a stockholder proposal requesting simple majority vote.

143.    The 2024 Proxy Statement misrepresented and failed to disclose that: (1) Project Focus was not succeeding in its goal of significantly lowering FMC inventory in the distribution channel; (2) FMC's channel inventories were not rebalancing or normalizing, but instead were getting worse; (3) Project Focus was failing to accelerate manufacturing cost reductions; (4) the Company's cost-plus pricing arrangements with key distributors would drastically lower FMC's revenues and profits near-term; (5) FMC's risk disclosures were materially false and misleading because they characterized as mere possibilities adverse facts that had already materialized; and (6) as a result of the above, the Individual Defendants' positive statements regarding the Company's business, operations, and prospects were materially false and/or misleading and lacked a reasonable basis at all relevant times.

144.    The misleading information contained in the 2024 Proxy Statement was material to FMC's stockholders in determining whether or not to elect these defendants, vote on executive compensation, and approve the stockholder proposal. This information was also material as to the integrity of the directors that were proposed for election to the Board.

145.    By reason of the conduct alleged herein, the Individual Defendants violated section 14(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct,

FMC misled and/or deceived its stockholders by making misleading statements that were essential to securing stockholders approval of FMC's recommendation to reelect certain Board members, vote on executive compensation, and approve the stockholder proposal requesting simple majority vote. The proxy solicitation process in connection with the 2024 Proxy Statement was an essential link in the reelection of nominees to the Board and the decision to adopt the proposal requesting simple majority vote.

146.    The 2024 Proxy Statement was also materially misleading because the Board did not disclose that the Company failed to maintain adequate disclosure controls and procedures with respect to FMC's operations.

147.    Additionally, the Board failed to implement reasonable internal controls to ensure that obstacles created by excessive inventory amidst lowered demand were brought to the Board's attention in a timely fashion.

148.    FMC was damaged because of the Individual Defendants' material misrepresentations and omissions in the 2024 Proxy Statement that resulted in the improper reelection of Board members and vote for the shareholder proposal.

149.    Plaintiff, on behalf of FMC, has no adequate remedy at law.

## CLAIM II

**Against the Individual Defendants for Violations of Section 10(b) of the Exchange Act**

150.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

151.    The Individual Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

152.    The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the materially false statements contained herein, which they knew or

deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements not misleading.

153.   The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices, and a course of conduct that included the making of, or participation in the making of, untrue and misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about FMC not misleading.

154.   The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by FMC.

155.   The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations/omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were directly responsible for the false and misleading statements and omissions disseminated to the public through press releases and filings with the SEC.

156.   The Individual Defendants, by virtue of their receipt of information reflecting the true facts of FMC, their control over, and/or receipt and/or modification of FMC's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning FMC, participated in the fraudulent scheme alleged herein.

157.     As a result of the foregoing, the market price of FMC common stock was artificially inflated during the Relevant Period. In ignorance of the falsity of the statements, Plaintiff and other shareholders relied on the statements described above and/or the integrity of the market price of FMC common stock in purchasing FMC common stock at prices that were artificially inflated and was damaged thereby.

158.     By virtue of the foregoing, the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

159.     Plaintiff, on behalf of FMC, has no adequate remedy at law.

## CLAIM III

**Against Defendants Douglas, Sandifer, and Brondeau for Contribution Under Sections 10(b) and 21D of the Exchange Act**

160.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

161.     The conduct of defendants Douglas, Sandifer, and Brondeau as described herein has exposed the Company to significant liability under various federal securities laws by their misconduct.

162.     FMC, Douglas, Sandifer, and Brondeau are named as defendants in the Securities Class Action that alleges and asserts claims arising under the federal securities laws. FMC is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein.

163.     If FMC is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of Defendants Douglas, Sandifer, and Brondeau as alleged herein, who have caused the Company to suffer substantial harm through their misconduct. FMC is entitled to contribution and

indemnification from Defendants Douglas, Sandifer, and Brondeau in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

164.    As officers and/or directors, Defendants Douglas, Sandifer, and Brondeau had the power or ability to, and did, control or influence, either directly or indirectly, FMC's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated the federal securities laws.

165.    Defendants Douglas, Sandifer, and Brondeau are liable under §21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of any private right of action for contribution asserted pursuant to the federal securities laws.

166.    Defendants Douglas, Sandifer, and Brondeau have damaged the Company and are liable to the Company for contribution.

167.    As such, FMC is entitled to receive all appropriate contribution or indemnification from defendants Douglas, Sandifer, and Brondeau.

## CLAIM IV

### Against the Individual Defendants for Breach of Fiduciary Duty

168.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

169.    By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care. The Individual Defendants also had specific fiduciary duties as defined by the Company's corporate governance documents and principles which could have prevented the misconduct and subsequent harm to FMC alleged herein had those obligations been appropriately discharged.

170.   The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonably inquiry, oversight, good faith, and supervision by knowingly causing or allowing the Company to disseminate materially misleading and inaccurate information to FMC shareholders regarding FMC's business operations, practices, and internal controls in connection therewith. These actions were not a good faith exercise of prudent business judgment to protect and promote FMC's corporate interests.

171.   The Director Defendants either knew of or recklessly disregarded the fraudulent scheme alleged herein. By their actions, the Director Defendants abandoned and abdicated their responsibilities and duties to prudently manage the business of FMC in a manner consistent with their fiduciary duties. The Director Defendants breached their fiduciary duties by recklessly issuing or recklessly permitting the Company to issue improper statements.

172.   Further, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith by approving the statements described herein and made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions. The Audit Committee Defendants utterly failed in their duty of oversight and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

173.   Defendants' false or misleading statements and omissions were made in connection with the purchase or sale of the Company's stock by the Company itself. While the price of the Company's common stock was inflated due to the false or misleading statements, Defendants caused the Company to repurchase over $5.2 million in shares of its own common stock at prices that were artificially inflated due to the false or misleading statements.

174.    By committing and permitting the misconduct alleged herein, the Individual Defendants breached their fiduciary duties in the management and administration of FMC's affairs and in the use and preservation of FMC's assets.

175.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, FMC has sustained significant damages, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, waste of corporate assets, and reputational harm.

176.    Plaintiff, on behalf of FMC, has no adequate remedy at law.

### CLAIM V

**Against the Individual Defendants for Waste of Corporate Assets**

177.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

178.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and ongoing through the Relevant Period and resulted in continuous, connected, and ongoing harm to the Company.

179.    As a result of the misconduct described above, and by failing to properly consider the interests of FMC and its shareholders, the Individual Defendants wasted corporate assets by, *inter alia*, forcing the Company to (i) expend valuable resources repurchasing its own shares at artificially inflated prices; (ii) pay the improper, unnecessary and unjustified compensation and awards and benefits to the Individual Defendants; (iii) incur potentially millions of dollars of legal liability and/or legal costs to investigate and defend Defendants' unlawful actions; (iv) lose financing from investors and business from future customers who no longer trust FMC and its products.

180.    Additionally, as a result of the Individual Defendants' misstatements and failure to implement adequate internal controls to ensure that the Company's SEC filings and other public statements were not misleading, FMC is subject to a Securities Class Action, related shareholder derivative lawsuits, and scrutiny. The Individual Defendants have caused FMC to waste its corporate assets by forcing the Company to expend valuable resources in defending itself in the various matters, in addition to any ensuing costs from a potential settlement or adverse judgment.

181.    As a result of the waste of corporate assets, FMC has sustained significant harm.

182.    Accordingly, the Individual Defendants are liable to the Company.

183.    Plaintiff, on behalf of FMC, has no adequate remedy at law.

## CLAIM VI

### Against the Individual Defendants for Unjust Enrichment

184.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

185.    By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material facts the Individual Defendants made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of and to the detriment of FMC as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to FMC.

186.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

187.    Plaintiff, as a shareholder and representative of FMC, seeks restitution from the Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits,

benefits, and other compensation obtained by the Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

188.    Plaintiff, on behalf of FMC, has no adequate remedy at law.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on behalf of FMC, demands judgment as follows:

A.    Against all of the Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Defendants' breaches of fiduciary duties, waste of corporate assets, unjust enrichment, and violations of the federal securities laws;

B.    Awarding FMC restitution from Defendants, and each of them, and ordering disgorgement of all profits, salaries, benefits, and other compensation obtained by the defendants;

C.    Awarding equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that Plaintiff, on behalf of FMC, has an effective remedy;

D.    Directing FMC to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect FMC and its shareholders from a repeat of the damaging events described herein;

E.    Awarding Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: August 6, 2026                    **THE ROSEN LAW FIRM, P.A**.

                                        */s/ Olivia D. Simkins*
                                        _____

Olivia D. Simkins
101 Greenwood Avenue, Suite 520
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: osimkins@rosenlegal.com

Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: philkim@rosenlegal.com

*Counsel for Plaintiff Mark Beard*

**VERIFICATION**

I, Mark Beard am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.     7/24/2026

Mark Beard